OPINION
{¶ 1} Defendant-appellant Dawn Bailey appeals from her conviction and sentence for Felonious Assault, with a firearm specification. Bailey was also convicted and sentenced, during the same proceedings, for Possession of Cocaine, but this appeal is only concerned with her conviction and sentence for Felonious Assault.
 {¶ 2} Bailey contends that her conviction for Felonious Assault is against the manifest weight of the evidence. Specifically, she contends that the jury's conclusion that she knowingly intended to cause her victim, a police officer, physical harm is against the manifest weight of the evidence. We conclude that a jury could reasonably infer, from the officer's testimony, that Bailey had the requisite intent to cause the officer physical harm when she pointed the gun at him and walked quickly toward him, with the gun pointed at his forehead, while expressly stating her intention to kill him. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Sugarcreek police officer Terry McClanahan was dispatched to the apartment complex in which defendant-appellant Dawn Bailey was then residing in response to her 911 call. McClanahan testified concerning his encounter with Bailey, after his arrival upon the scene, as follows:
 {¶ 4} "Q. All right. Now, when this person turned or gave their attention to you, what happened then?
 {¶ 5} "A. As the female turned towards me, I noted that she had her right hand up near her head — up near her head. (Indicating).
 {¶ 6} "* * *
 {¶ 7} "Q. Could you tell if anything was in her hand at that point?
 {¶ 8} "A. At that point I really couldn't tell if there was anything in her hand or not initially.
 {¶ 9} "Q. All right. What happened then? What did you observe then?
 {¶ 10} "A. Well, as she turned, she was — she was yelling and talking very loud and she started making some statements at that point in time.
 {¶ 11} "Q. Do you recall what they were?
 {¶ 12} "A. Well, she was yelling that she was an FBI agent and a CIA agent, and then after that at some point she was yelling that she was going to fucking kill herself.
 {¶ 13} "Q. Now, as these comments are being made, is she just standing still or is she moving anywhere?
 {¶ 14} "A. As she turned and faced me she was making those statements and then she was talking very fast and then she started walking very fast toward me.
 {¶ 15} "Q. Okay. What did you observe about the change, if any, of the hand to the head?
 {¶ 16} "A. Well, once she made her statement about killing herself with her hand up there, as she was walking closer, I noticed a black object in her hand. (Indicating) At that point I realized that it was a gun.
 {¶ 17} "Q. Okay. As she is walking toward you, you realize she has a gun in her hand. What happens next?
 {¶ 18} "A. Well, at that point I decide I was going to take absolutely no action whatsoever and I just basically stood still and tried to talk to her in a calm, low voice.
 {¶ 19} "Q. Now, was she still approaching you?
 {¶ 20} "A. She was, and as she got toward me, got closer to me, she moved her hand from her head with the pistol in her hand and extended her arm out in front of her with her elbow locked and pointed the gun at me.
 {¶ 21} "Q. When you say elbow locked, you mean arm straight out? (Indicating)
 {¶ 22} "A. Yes.
 {¶ 23} "Q. Perpendicular to the body?
 {¶ 24} "A. That's correct.
 {¶ 25} "Q. As this is occurring, is she still walking toward you?
 {¶ 26} "A. She is.
 {¶ 27} "Q. What did you do then?
 {¶ 28} "A. Well, I was still trying to talk to her and calm her down, but as she's walking across there, then she made another statement to me, that she was going to fucking kill me. She said, `I will fucking kill you.'
 {¶ 29} "Q. What response, if anything, did you make to that statement?
 {¶ 30} "A. Again, I just, you know, just put my arms up to my side and said, you know, `Just calm down. Everything is fine,' you know, `Don't hurt yourself or anybody else,' or, you know, things of that nature to try to calm her down. (Indicating)
 {¶ 31} "* * *
 {¶ 32} "Q. Did she keep walking toward you?
 {¶ 33} "A. She walked right up to in front of me. She had her arm still extended out with the gun and she stopped with the gun, I don't know exactly how many inches, but the gun was relatively close in proximity and was aimed at my forehead.
 {¶ 34} "* * *
 {¶ 35} "Q. And your response was what in response to the words she said to you, or non-response, at least in terms of not reaching for your weapon? What did you do next? She's standing there in front of you with the gun pointed toward your face. What did you do?
 {¶ 36} "A. As I was talking with my hands a little bit high, (indicating) I had decided that I was going to grab the gun and her hand that had the gun in it and get it away from my head because she said she was going to shoot me, so I believed her so I grabbed her hand.
 {¶ 37} "Q. Okay. When she came to a stop in front of you, had the gun in front of you, to the time you decide to reach to grab her, do you know how much time passed there, and I know you didn't have a clock on you. Was it fairly quickly or long?
 {¶ 38} "A. If I understand your question from the time she finally stopped in front of me, at that point, until I grabbed her hand, was relatively a short period of time, very short period of time.
 {¶ 39} "Q. All right. And did you, in fact, grab her hand?
 {¶ 40} "A. I did.
 {¶ 41} "Q. And how did you do that?
 {¶ 42} "A. Well —
 {¶ 43} "Q. Tell you what, demonstrate on me. Let's say I'm her pointing at you. (Indicating) What did you do?
 {¶ 44} "A. She was a little bit closer and her hand was up here. As I was talking, I grabbed her hand like this and pushed it away from my head. (Indicating)
 {¶ 45} "Q. Okay. Both hands?
 {¶ 46} "A. Yes.
 {¶ 47} "Q. Okay. From —
 {¶ 48} "A. From there, I pull her on down, her hand on down to my side over here to get it away so it's pointing down to the ground in case it would discharge or if she would pull the trigger so that nobody else would be hurt. (Indicating)
 {¶ 49} "Q. Are you both still standing?
 {¶ 50} "A. Yes.
 {¶ 51} "Q. Okay. Tell us what happened at that point. Give us your narrative of how the struggle went at that point.
 {¶ 52} "A. At this point I've got it down to my side near my left leg. She is still yelling and, you know, screaming and just carrying on, so to speak.
 {¶ 53} "Q. Were you saying anything to her?
 {¶ 54} "A. `Let loose of the gun,' you know, things like that, and at that point the gun fired.
 {¶ 55} "* * *
 {¶ 56} "Q. Now, did you happen to notice when the gun was at your face if her finger was on the trigger?
 {¶ 57} "A. It was, yes.
 {¶ 58} "Q. And when you grabbed the gun, did you notice whether or not her finger left the trigger?
 {¶ 59} "A. I didn't. Once I pushed her hand over to the side and down, I really didn't have a direct sight on her finger and I didn't notice her finger was on the trigger until after we were on the ground.
 {¶ 60} "Q. After the gun discharged what happened?
 {¶ 61} "A. At that point that scared me to death, so I took her all the way down to the ground and she was still holding the pistol in her right hand and she was basically laying on her back, but because of the fact I was semi on top of her, she was kind of rolled over just slightly onto her left side, just slightly, and her right hand with the pistol was across her chest and down and over and I was holding it down over there. (Indicating)"
 {¶ 62} During the ensuing struggle, McClanahan was not able to get the gun from Bailey's grasp. Another officer, Tim Fallis, arrived on the scene, and assisted McClanahan, but even the two police officers, together, were unable to remove the gun from Bailey's grasp.
 {¶ 63} Finally, a third officer, Brian Deckard, arrived on the scene. With his assistance, the officers were able to spray pepper spray on Bailey. The effects of the spray enabled the officers to remove the gun from Bailey's grasp, and then secure both the gun and Bailey.
 {¶ 64} Bailey was charged, in the alternative, with Attempted Murder and with Felonious Assault. Both of these counts, which contain firearm specifications, related to her conduct toward McClanahan. Bailey was also charged with Felonious Assault upon Fallis. Bailey was also charged with two counts of Possession of Cocaine. One of these counts resulted from cocaine found in her apartment at the time of her arrest. The other count pertained to a prior incident.
 {¶ 65} At the conclusion of a jury trial, Bailey was found not guilty of Attempted Murder, but guilty of Felonious Assault upon McClanahan, with a firearm specification. Bailey was acquitted on the count of Felonious Assault relating to Fallis. Bailey was convicted of Possession of Cocaine relating to the cocaine found in her apartment at the time of her arrest, but was acquitted of the other count of Possession of Cocaine. Bailey was sentenced to three years for Felonious Assault, with an additional three-year sentence for the firearm specification, to be served consecutively. Bailey was sentenced to nine months on the charge of Possession of Cocaine, to be served concurrently with her sentence for Felonious Assault. The trial court also imposed a mandatory six-month driver's license suspension.
 {¶ 66} From her conviction and sentence for Felonious Assault, Bailey appeals. She does not challenge her conviction and sentence for Possession of Cocaine.
 II {¶ 67} Bailey's sole assignment of error is as follows:
 {¶ 68} "The Verdict Of The Jury Was Against The Manifest Weight Of The Evidence."
 {¶ 69} Bailey argues that her conviction for Felonious Assault is against the manifest weight of the evidence. She does not challenge her conviction and sentence for Possession of Cocaine.
 {¶ 70} Bailey was convicted of Felonious Assault, in violation of R.C. 2903.11(A)(2), which provides as follows:
 {¶ 71} "No person shall knowingly do either of the following:
 {¶ 72} "(1) . . .;
 {¶ 73} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 74} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 75} In order to convict Bailey of Felonious Assault upon McClanahan, the jury had to find that she knowingly attempted to cause physical harm to McClanahan by means of a deadly weapon. Bailey argues that the jury's finding in this regard is against the manifest weight of the evidence.
 {¶ 76} Although Bailey discounts the discrepancies between her testimony and McClanahan's testimony as minor, these discrepancies are significant. McClanahan testified that Bailey pointed the gun at him, walked quickly toward him, with her finger in the trigger area, told him that she was going to kill him, and stopped with the gun pointed at, and inches from, McClanahan's forehead. McClanahan testified that after a "very short period of time" from Bailey's having stopped with the gun pointed at his forehead, having declared her intention to kill him, he grabbed hold of her hand and deflected the gun. That the gun then went off, a fact that Bailey does not dispute, establishes that it was loaded and capable of being fired.
 {¶ 77} Bailey contested McClanahan's testimony at a number of important respects. Besides denying that she ever had any intention of shooting McClanahan, Bailey testified that she did not point the gun at him, but merely extended her hand in McClanahan's direction, with the intention of surrendering the gun to him. She also denied that she ever stated her intention of killing McClanahan. These are significant discrepancies.
 {¶ 78} The jury evidently chose to credit McClanahan's testimony. We have reviewed the entire transcript of the trial, and we find nothing inherently incredible in McClanahan's testimony. Furthermore, there are reasons why the jury might have tended to disbelieve Bailey. Obviously, she had a motive to deny that she intended to shoot McClanahan. Furthermore, although she admitted having taken cocaine, and further admitted to bizarre behavior, including intending to kill herself and saying that she was an agent of the CIA or FBI, which statement she was unable to explain, she denied she was "high" on cocaine. Also, when Bailey gave a statement to the police the day after the incident, and was asked about that part of the incident where she approached McClanahan, her response was that she had blacked out, and did not remember anything. At trial, she testified concerning that part of the incident. Under cross-examination, Bailey explained that when she had told the police she had blacked out and did not remember anything, she merely meant that she could not then recall that part of the episode, but had had time to marshal her recollections since then. The jury might reasonably have chosen to discredit this explanation, however.
 {¶ 79} In short, we find unremarkable the jury's decision to credit McClanahan's testimony where it conflicted with Bailey's testimony. From McClanahan's testimony a jury could reasonably infer that Bailey, being then under the influence of great personal stress (which she acknowledged), and also the influence of cocaine (which she denied), had the requisite intention to shoot McClanahan when she pointed a loaded, operable gun at his head, walked quickly toward him, with her arm perpendicular in front of her body and elbow locked, and declared her intention to kill him. The jury could reasonably conclude that either immediately after Bailey came within range for McClanahan to do so, or, in any event, within a "very short period of time," McClanahan grabbed Bailey's hand and deflected the gun, thereby preventing her from carrying out her intention.
 {¶ 80} Bailey acknowledged that she understood that McClanahan was a police officer. The intensity with which she struggled, after having been taken to the ground, to maintain her hold on the gun is consistent with the inference that she intended to use it as a weapon against McClanahan.
 {¶ 81} For us to reverse a conviction as against the manifest weight of the evidence, we must conclude that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Statev. Thompkins (1997), 78 Ohio St.3d 380, 387 quoting from State v. Martin
(1983), 28 Ohio App.3d 172, 175. In the case before us, we conclude that the jury did not clearly lose its way, and that Bailey's conviction for Felonious Assault does not constitute a manifest miscarriage of justice.
 {¶ 82} Bailey's sole assignment of error is overruled.
 III {¶ 83} Bailey's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, J., concurs.